**In re SOUTHERN INDUSTRIAL BANKING CORPORATION, d/b/a Daveco, Debtor.**

**Thomas E. DuVOISIN, Liquidating Trustee, Plaintiff,**

v.

**FEDERAL SAVINGS AND LOAN IN-SURANCE CORPORATION, as Receiver for American Savings and Loan Association, Defendant.**

Bankruptcy No. 3–83–00372.

Adv. P. No. 3–84–0228.

United States Bankruptcy Court, E.D. Tennessee.

April 20, 1987.

See also, 71 B.R. 351.

Hunton & Williams, John A. Lucas, Jeffrey S. Norwood, Knoxville, Tenn., for plaintiff.

Jenkins & Jenkins, Michael H. Fitzpatrick, Knoxville, Tenn., for defendant.

### MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

This is an adversary proceeding brought by Thomas E. DuVoisin, Liquidating Trustee for Southern Industrial Banking Corporation ("SIBC"), against American Savings and Loan Association ("American") to recover avoidable preferences. 11 U.S.C.A. § 547(b) (West 1979). On November 16, 1984, pursuant to Resolution No. 84–624 of the Federal Home Loan Bank Board ("FHLBB"), American was declared insolvent and the Federal Savings and Loan Insurance Corporation ("FSLIC") was ap-

pointed receiver. By order of this court entered on December 6, 1984, the FSLIC in its capacity as receiver for American, was joined as a defendant to this action. Defendants assert that the transfers are excepted from the voidable preference rule by the "ordinary course of business" exception of § 547(c)(2).

This court has jurisdiction pursuant to 28 U.S.C.A. §§ 1334 and 157(a) (West Supp. 1987). This is a core proceeding. 28 U.S.C.A. § 157(b)(1) and (b)(2)(F) (West Supp. 1987).[1]

## I

The facts have been stipulated.

1. On March 10, 1983, SIBC filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code.

2. Thereafter pursuant to SIBC's Modified Plan of Reorganization as confirmed by this court, certain SIBC claims, including this action, were transferred to the Creditor's Liquidation Trust. Plaintiff was appointed and confirmed as the Liquidating Trustee for the Creditor's Liquidation Trust.

3. On December 7, 1982, American opened a "Special Passbook" account at SIBC by depositing $510,000.00 into a SIBC passbook account (the "Account").

4. On December 30, 1982, SIBC transferred to American the sum of $460,000.00, representing the first partial payment of the antecedent debt evidenced by the Account.

5. On January 21, 1983, SIBC transferred to American the sum of $49,000.00, representing the second partial payment of the antecedent debt evidenced by the Account.

6. On January 26, 1983, SIBC transferred to American the sum of $4,539.47, representing final payment of the antecedent debt evidenced by the Account.

7. SIBC was insolvent at the time of the deposit and transfers described above.

8. The transfers described above were made within ninety (90) days of the filing of SIBC's voluntary petition under Chapter 11 of the Bankruptcy Code.

9. The transfers described above would enable American to receive more than it would receive if this case were a case under Chapter 7 of the Bankruptcy Code, if the transfers had not been made, and if American received payment of its debt to the extent provided by the provisions of Title 11, United States Code.

10. The transfers in the total amount of $513,539.47 from SIBC described in the plaintiff's complaint were made to or for the benefit of American.

11. The deposit by American and later payment by SIBC did not constitute a contemporaneous exchange.

12. SIBC calculated interest monthly on the Account. SIBC posted interest quarterly on the Account.

13. The transfers from SIBC described in the Plaintiff's Complaint were for or on account of the antecedent debt owed by SIBC to American.

14. American was a Tennessee-chartered savings and loan association insured by FSLIC and, thus, was regulated by Tennessee statutes and by FHLBB regulations.

15. Section 601 of the Tennessee Savings and Loan Act, Chapter 3 of Title 45, Tennessee Code Annotated, governed the type of investments American could make and provides that American could only invest in "[d]emand, time, or savings deposits, shares or accounts, or other obligations of any financial institution the accounts of which are insured by a federal agency."

16. Section 780-1-27-.12 of the rules of the Tennessee Department of Insurance required American to "make its deposits in a bank insured by the Federal Deposit Insurance Corporation."

17. SIBC was not a bank and investments in it were not insured by the FDIC,

1. The parties stipulated their consent to the court's entry of a final order, pursuant to 28 U.S.C.A. § 157(c)(2) (West Supp.1987), should the court determine that the present adversary proceeding is a related non-core proceeding under 28 U.S.C.A. § 157(b) (West Supp.1987).

the FSLIC, or any other state or federal institution.

18. American has admitted that "in January, 1983 it came to the attention of management at American that the passbook account it had with SIBC was not a qualified investment because SIBC was not federally insured." *See* Answers to Request for Admissions, No. 3.

19. American also has stated that its investment in SIBC was improper because "you don't invest in uninsured institutions with other depositors' money." *American Dep.* at 95. (A Fed.R.Civ.P. 30(b)(6) deposition of American by its designated agent, Gerald F. Lambert, was taken on September 17, 1984. This deposition will be cited as *"American Dep.* at ____.")

20. The Fed.R.Civ.P. 30(b)(6) deposition of American by its designated agent, Gerald F. Lambert, taken on September 17, 1984, a copy of which has been filed with the Court, may be considered by the Court as admissible evidence in this proceeding in lieu of the live testimony of an agent of American.

21. The first transfer of $460,000.00 from SIBC to American made on December 30 or 31, 1982, was subsequently deposited by American on or about January 4, 1983, into its account no. 0–889–035 at Blount National Bank in Maryville, Tennessee to cover an overdraft of $447,402.75 which existed in that account as of December 31, 1982. Exhibits "B" and "G" and *American Dep.* at 42–48.

22. American regarded having a substantial overdraft in one of its bank accounts as an unusual event and a problem and something outside of its normal course of business. *American Dep.* at 48.

23. American's officers were responsible for making the investment decisions for the association. *American Dep.* at 27. The actual financial transactions implementing those investment decisions, however, were normally handled by American's employees. *American Dep.* at 45 and 88–89.

24. The second transfer of $49,000.00 from SIBC to American made on January 21, 1983, was done at the direction of the FSLIC because American's investment at SIBC was not an authorized investment. *American Dep.* at 90; Exhibit "G."

25. Mr. Kenneth Seaton, president and chief executive officer of American, physically went to SIBC and withdrew the $49,000.00 from SIBC. The $49,000.00 was then deposited in American's account at United American Bank in Knoxville, Tennessee on the same day. *American Dep.* at 87–89; Exhibit "C."

26. American has stated that the handling of a routine financial transaction such as the $49,000.00 withdrawal from SIBC by the president and chief executive officer of the association was not the norm in the industry and "something that would be handled by someone other than the president of the association." *American Dep.* at 89.

27. American has no explanation for why only $49,000.00 was withdrawn by Mr. Seaton rather than the entire balance of the account after the FSLIC informed American that its investment in SIBC was not an authorized investment. *American Dep.* at 103–04.

28. The third transfer of $4,539.47 from SIBC to American was made on January 26, 1983. The debt at issue in this case was incurred when the initial investment was made by American at SIBC on December 7, 1982. The 45th day after December 7th is January 21, 1983. Exhibits "D" and "E."

29. American's investment at SIBC earned interest at ten percent (10%) per annum. Had American invested the $510,000.00 in federal funds at a Federal Reserve Bank rather than at SIBC during the time of this investment, it would have earned a greater rate of return than it received at SIBC, the investment would have been more liquid and would have been an authorized investment for American to make. *American Dep.* at 128–31. Exhibit "F."

## II

All elements necessary to establish a voidable preference under § 547(b) of the

Bankruptcy Code have been stipulated: (1) a transfer of SIBC's property to a creditor; (2) on account of an antecedent debt; (3) while SIBC was insolvent; (4) within 90 days of SIBC's petition in bankruptcy; and (5) that enables the creditor to receive more than it would receive under a Chapter 7 liquidation. Thus, the sole issue to be determined by the court is whether the initial investment and subsequent withdrawals by American were within the "ordinary course of business" exception to the trustee's avoiding powers pursuant to § 547(c)(2).

■ To fall within this exception to the avoiding power of the trustee, the transaction must have been within the ordinary course of business of *both* the debtor and the transferee and made according to ordinary business terms.

The clear purpose of the "ordinary course of business" exception "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6329; *see* S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5874. The intent was to insulate ordinary trade credit transactions that are kept current. Thus, payments made to employees, suppliers, and others for operating expenses or trade credit transactions were intended to be exempt from recovery. See Levin, *An Introduction to the Trustee's Avoiding Powers*, 53 Am. Bankr. L.J. 173 (1979).

### III

■ American's investment in SIBC was neither in the ordinary course of business nor made according to ordinary business terms. American was not authorized to invest in an uninsured industrial loan and thrift company. American was a Tennessee-chartered savings and loan association insured by FSLIC and, thus, regulated by Tennessee statutes and FHLBB regulations. American could only invest in de-

mand, time, or savings deposits, shares of accounts, or other obligations of a financial institution the accounts of which are insured by a federal agency. SIBC was not insured. Therefore, American's deposit in SIBC was an unauthorized transaction and clearly not in American's ordinary course of business.

American has conceded that its investment was improper: "[Y]ou don't invest in uninsured institutions with other depositors' money." Deposition of Gerald F. Lambert at 95. Stipulation No. 19.

Few courts have addressed the meaning of the terms "ordinary course of business" and "ordinary business terms." One such case makes it clear that "ordinary" contemplates, at least in part, that which is ordinary as between the respective parties. *Ewald Bros., Inc. v. Kraft, Inc. (In re Ewald Bros., Inc.)*, 45 B.R. 52, 57 (Bankr. D.Minn.1984).

An act that violates a statute and authorized regulations can under no circumstances be construed as an "ordinary course of business transaction" or "according to ordinary business terms." Since the initial investment of $510,000.00 by American in a "special passbook" uninsured account at SIBC is not within its ordinary course of business or according to ordinary business terms, it follows that any later transactions or withdrawals by American are likewise "unusual." Therefore, all transfers by SIBC to American are preferential, and not entitled to the § 547(c)(2) exception to the trustee's avoiding powers. It is therefore unnecessary to address other issues raised by the plaintiff concerning the three (3) separate transfers by SIBC to American, and SIBC's authority to accept American's deposit. Judgment will be rendered in favor of the plaintiff in the amount of $513,539.47, together with interest and costs.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.